**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEALAN JONES, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12 C 09997 |
| | ) | |
| WILLIAM F. McGUFFAGE, *et al*., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The plaintiffs argue that the State of Illinois has established unconstitutionally onerous requirements on independent and "new" party candidates for getting their names on the ballot for the April 9, 2013, special election for the Second Congressional District seat recently vacated by Jesse Jackson, Jr. They seek a preliminary injunction placing Green Party candidate LeAlan Jones and independent candidate Marcus Lewis on the ballot, or alternatively drastically reducing the current requirement of 15,682 valid signatures from supporters to 525 signatures (a number derived from the requirements for Republican primary candidates). Time is of the essence. The candidates' signed petitions with the requisite number of signatures currently are due on Monday, February 4, 2013. There will be a truncated period during which challenges to the candidates' signatures can be filed and resolved, and then the ballots must be printed with sufficient time to allow their distribution overseas to absentee voters. The state (with help from a consent decree in an unrelated case) has set this "drop dead" date at March 8, 2013.

The Court has endeavored to set forth its decision in as much detail possible while being respectful of the parties' respective time restraints going forward. For the reasons that follow, the Court grants the motions for preliminary injunction and orders relief as described below.

## FACTS

For purposes of satisfying its obligations under Federal Rules 52(a) and 65(d), the Court makes the following findings of fact, which are derived from the parties' exhibits and the testimony at the evidentiary hearing. They are preliminary in nature and not binding in any proceedings on the merits. *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011).

On November 21, 2012, just days after he was re-elected to his seat, Jesse Jackson, Jr., the incumbent member of U.S. House of Representatives from the Illinois Second Congressional District, resigned from that position. Under Illinois law, when such a vacancy occurs more than 180 days before the next general election, a special election must be held pursuant to § 25-7 of the Illinois Election Code, 10 ILCS 5/25-7. As of Nov. 21, 2012, that statute provided: "When any vacancy shall occur in the office of representative in congress from this state more than 180 days before the next general election, the Governor shall issue a writ of election within 5 days after the occurrence of that vacancy to the county clerks of the several counties in the district where the vacancy exists, appointing a day within 115 days to hold a special election to fill such vacancy."

Special elections generally must proceed according to the normal rules in the Illinois Election Code. *See* 10 ILCS 5/25-7-61. Those rules prescribe procedures for nominating major-party candidates on the one hand, and new (that is, unestablished) party candidates and independent candidates on the other. *See* 10 ILCS 5/10-2, 10-3. The latter two kinds of candidates do not participate in primary elections; instead, to access the ballot, they must submit petitions signed by a number of supporters equal to 5% of voters in the last election for the office being sought. 10 ILCS 5/10-2, 10-3.

With Mr. Jackson's vacancy coming so soon on the tail of a general election, the Illinois General Assembly saw fit to amend the special election rules. It passed a one-off bill, Public Act 97-1134, that applied only to vacancies "occurring less than 60 days following the 2012 general election." *See* 10 ILCS 5/25-7(b). The new law provided for the holding a special primary election on February 26, 2013, and a special general election on April 9, 2013. *Id.* The date of the special election, all concede, was selected because a Chicago municipal election was already scheduled for that date; a large portion of the 2nd Congressional district lies within the city of Chicago. Intermediate deadlines for demonstrating ballot eligibility were established accordingly; as relevant here, the petitions of independent and new-party candidates to appear on the general election ballot were due to the State Board of Elections at least 64 days before the April 9 election—that is, February 4, 2013.

Aside from these changes to the usual timetable for special elections, the new law retained all the requirements already set forth by the election code. See *See* 10 ILCS 5/25-7(b) ("Except as provided in this subsection (b), the provisions of Article 7 of this Code are applicable to petitions for the special primary election and special election."). Therefore, independent and new-party candidates were still required to meet the 5% signature requirement. And because the turnout in the 2012 election was high, the required number of signatures is a higher-than-usual 15,682.

Plaintiff LeAlan Jones was the Illinois Green Party candidate for U.S. Senate in 2010, when he received more than 117,000 votes statewide (having met the ballot access requirement for statewide office of 25,000 signatures). He did not run against Congressman Jackson in the Second Congressional District in 2012, nor did any Green Party candidate. The Green Party focused its efforts in 2012 on two other congressional districts where it deemed its chances

3

better; it also ran a candidate for President. The Green Party did not qualify as an established statewide party in Illinois based on the 2012 election results; therefore, for purposes of the special election, the Green Party is a "new" party in the second district. Mr. Jones testified at the preliminary injunction hearing.

In the short time that has elapsed since Congressman Jackson's resignation, Jones has attempted to drum up interest in his candidacy by attending candidate forums. His campaign has developed a website, albeit one that has functioned only intermittently, and has used social media to communicate with potential voters. To date, however, Jones has not organized a signature drive and is not aware that his campaign has collected a single signature on his behalf. Jones testified that even if he had the manpower, weather conditions and violent crime in the part of the district where his support is strongest have rendered him reluctant to ask volunteers to petition for signatures without extensive training.

The Illinois Green Party, whose chairman Phil Huckelberry testified at the hearing, also has not organized a signature drive in the Second District. Local Green Party organizations have been alerted about the need to gather signatures, and Huckelberry believes a group of activists based in Flossmoor is collecting signatures; however, he does not how many they have obtained. The Green Party and its members did not believe it would be worthwhile to launch a signature-collecting campaign so soon after the November 2012 elections and when the signature requirement was so high, based on the gross number of signatures constituting 5 percent of the high voter turnout in the 2012 election, as to be a "fool's errand." The party made little use of social media to organize any petitioning.

Based on his considerable experience supervising or participating in signature drives on behalf of Green Party candidates (including himself), Huckelberry believes that it would be

impossible for the Green Party to collect 15,682 signatures in 62 days in December and January, without any lead-up time in which to organize a signature drive before implementing it. In response to the State's arguments, Huckelberry stated that only experienced professionals can consistently get signatures at the rate of 20 per hour under ideal conditions, and the Green Party needs to rely on volunteers during this special election cycle. Huckelberry opined that in his experience, obtaining 15,000 signatures in a single Congressional district under any circumstances would require require an extremely high level of coordination as well as a significant sum of money.

Intervenor Marcus Lewis also testified. Mr. Lewis ran for Congressman Jackson's seat in November 2012. He got on the ballot by collecting 5000 signatures (the flat number required in a post-redistricting year) and ultimately received about 40,000 votes. He exhausted his resources mounting that campaign and cannot reproduce his efforts so soon after the election; in particular he cannot pay petitioners to gather signatures for him. However, he and two supporters have done whatever they can to collect signatures, so far obtaining about 645. They have been stymied by the weather conditions and lack of public events at which large numbers of people gather. Door-to-door campaigning has not been successful because of the weather and because people simply won't open their doors. Lewis asked for permission to use the indoor spaces at various public colleges, but apart from a single day when he was permitted to do so at Prairie State University, he has been excluded from those venues (with the exception of the parking lots).

Both the plaintiffs and the State presented expert testimony about the possibility of a candidate accumulating 15,682 signatures from a single congressional district in a 62-day period.

Plaintiffs' expert Richard Winger is a researcher and analyst of nationwide ballot access requirements who edits and writes for *Ballot Access News*. He testified that he has researched the

number of signatures in every state needed for a new-party or independent candidate to get on the ballot in a U.S. House district for every election since the time such records were available (1888). Winger testified that an independent or new-party candidate has *never* appeared on a ballot after successfully meeting a signature requirement of more than 13,000, and only three candidates have met a requirement that exceeded 10,000. He qualifies this statement by allowing for the possibility that someone was placed on a ballot in Illinois without getting the required number of signatures because there was no challenge; according to Mr. Winger, Illinois is the only state that allows candidates who fail to meet signature requirements to be listed on the ballot despite that failure if there is no challenge to their candidacy filed. Mr. Winger testified that only Illinois, California, Georgia, and California ever required more than 10,000 signatures in a single Congressional district. Almost all districts nationwide require 5,000 or fewer signatures to get on a congressional ballot.

The State's expert, Harold Hubschman, a political consultant and political organizer based in Massachusetts, is the president and founder of consulting firm that "specializes in helping political candidates, political parties and ballot initiative campaigns collect signatures to qualify for the ballot." His firm organizes professional (paid) petition drives in which the signature-gatherers are paid from $2.00 to $4.00 per signature. The firm also can assist with a signature drive by training and organizing volunteers for a flat fee. In his opinion, "the requirement that a candidate obtain 15,682 valid signatures in 62 days is readily achievable for a campaign team with a reasonable number of volunteers and a campaign or signature drive manager with basic organizing skills." He opined that petitioners can be counted on to collect 20 signatures per hour in good location. Therefore, the Lewis or Jones campaigns would need 13 petitioners per day to gather 20 signatures apiece to exceed the 15,682 requirement. Based on

6

that rate, the same number could be gathered on weekends only, with 10 petitioners working five hours per day on eight Saturdays and eight Sundays. In the Second Congressional District, he recommended targeting unspecified "train stations and other hubs for mass public transportation, sporting events, after-church social hours and other local events." Hubschman did not dispute Winger's testimony that no independent or new-party congressional candidate has ever been placed on the ballot after submitting more than 13,000 validated signatures. Hubschman also testified that he had no experience working with any non-incumbent candidate who was not running as a Democratic or Republican.

In Illinois, independent and new party-candidates have previously assailed as overly burdensome the normal requirement that they obtain, within a 90-day time period, signatures in an amount equal to 5% of the voters in the previous election for the office being sought. In the case of this special election, they must comply with the same signature requirement in two-thirds of the normally allotted time, without any prior notice and therefore no lead-time in which to prepare a signature drive, and, furthermore, with the petitioning period coinciding with Chicagoland's coldest months. The plaintiffs and their fact witnesses testified that these obstacles hindered their signature-gathering efforts when attempted and, in the case of the Green Party, discouraged them from actively organizing a signature drive at all.

### Procedural Background

On December 17, 2012, the Green Party plaintiffs—Jones, his supporter David Sacks, and the Illinois Green Party—sued the members of the Illinois State Board of Elections (for simplicity, the "State"). This court then granted independent candidate Lewis and his supporter Arthur Newman leave to intervene. The plaintiffs allege that the special-election ballot access requirements, facially and as applied, violate their First Amendment rights to freedom of

association and speech, as well as the Equal Protection Clause of the Fourteenth Amendment.[1] They seek an injunction that precludes enforcement of the special-election law as written and places Jones and Lewis on the ballot; alternatively, the plaintiffs ask that the signature requirement be lowered from 15,682 to 525, which is the number of signatures that a Republican candidate would need to get on the ballot for the special primary.

The parties briefed their positions according to an agreed schedule they proposed to the Court. On January 30, 2013, this Court conducted an evidentiary hearing. The parties supplied their final arguments in briefs filed the next day. Having considered all of the evidence and arguments on both sides,[2] for the reasons that follow, the Court grants the motion for a preliminary injunction, although it does not award the precise relief sought by the plaintiffs. Instead, the Court will enjoin enforcement of the Election Code to the extent that it requires the plaintiffs to submit in excess of 3,444 valid signatures in order to be placed on the ballot for the April 9, 2013, special election.

## DISCUSSION

As an initial matter, the State has argued that the plaintiffs lack "standing" to challenge the normal general election rules imposing a 5% signature requirement to be completed within 90 days. The Court does not view this as a standing issue; rather, it is a claim that is not presented (though the plaintiffs' disagreement with the 5% requirement in all cases is clear). The

---

[1] Plaintiffs assert both facial and as-applied challenges to the special election statute. They acknowledge, however, that they have largely prosecuted their claim as a facial challenge and the Court has therefore treated it as such. The Court's ruling is predicated on its conclusion that the statute imposes unconstitutional burdens not as peculiarly applied to these plaintiffs but on its face.

[2] In light of the proceedings at the evidentiary hearing, during which each side agreed to accepting the opposing party's affidavit as direct testimony, the Court denies the State's motion to strike Mr. Winger's affidavit and grants the State's motion to file the affidavit of Mr. Hubschman.

plaintiffs mount both a facial and an as-applied challenge to 10 ILCS 5/25-7(b). True, that law incorporates the 5% requirement from §§ 5/10-2 and 10-3, but the Court understands the plaintiffs simply to be arguing that the special election law is unconstitutional to the extent it imposes the 5% requirement in the circumstances—the timeframe—prescribed by § 25-7(b). The challenge is facial, in addition to as-applied, because they argue that law is unconstitutional as applied to *any* prospective candidate subject to the 5% requirement in this special election cycle. The plaintiffs' standing is evident. *See Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) ("no question" of the standing of candidate to sue immediately upon declaring candidacy for relief from signature requirement, "in advance of the submission or even collection of any petitions").

To obtain a preliminary injunction, the plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010) ("*Judge I*"). "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id.* A preliminary injunction is an extraordinary form of relief and should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Chicago Dist. Council of Carpenters Pension Fund v. K & I Construction, Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001).

**A. Likelihood of success on the merits**

Here, the parties primarily dispute whether the plaintiffs can demonstrate a likelihood of success on the merits. The Seventh Circuit emphasizes that this inquiry is entirely separate from the resolution of the merits of the case. *See Michigan v. U.S. Army Corps of Engineers* 667 F.3d

765, 782 (7th Cir. 2011). Moreover, "the threshold for establishing likelihood of success is low." *Id*. Initially it requires only a showing that there is a "better than negligible" chance of winning on the merits. *AM General Corp. v. DaimlerChrysler Corp*., 311 F.3d 796, 804 (7th Cir. 2002). Once that chance has been established, "the analysis turns to a 'sliding scale' under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms." *Id*.

### 1. Constitutional Framework

The plaintiffs' claims arise under the First and Fourteenth Amendments.[3] Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986); *see Norman v. Cook County Officers Electoral Bd*., 502 U.S. 279, 288 (1992) ("The right [to create and develop new political parties] derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences."); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (the "primary concern" is with "the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.'"); *Ill. St. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (restrictions implicate "the right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."). And

---

[3] Although plaintiffs nominally invoke both equal protection and the First Amendment, the specific interests they trumpet and the tenor of their arguments tracks First Amendment principles more closely than the equal protection rights of minor party or independent candidates. Accordingly, this Court, like the parties, approaches the case primarily through the lens of the First Amendment.

when the burdens of ballot-access restrictions fall disproportionately and unjustifiably upon certain types of candidates, the Equal Protection Clause is implicated. *Williams v. Rhodes*, 393 U.S. 23 30-31 (1968) (explaining that minority parties are protected from unequal burdens that amount to invidious distinctions). These rights have been described as "fundamental." *See Socialist Workers Party*, 440 U.S. at 184.

Nevertheless, the rights are not absolute. States have valid and important interests in regulating elections, including interests in: (1) limiting the number of candidates to avoid ballot overcrowding; (2) preserving the fairness and integrity of the electoral process; and (3) avoiding confusion, deceptions, or frustration of the democratic process. *See Munro,* 479 U.S. at 193; *Jenness v. Forston*, 403 U.S. 431, 442 (1970). It is established "with unmistakable clarity" that states have a "right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro*, 479 U.S. at 194.

### 2. Standard of Review

Given the important rights at stake on both sides of this dispute, the parties dispute the appropriate level of scrutiny that applies to Illinois ballot-access restrictions. The plaintiffs argue with ample precedent that "strict scrutiny" must be applied to laws that restrict fundamental rights of the sort at stake here. On the other hand, the state contends (also with authority) that heightened scrutiny should not apply to a restriction that, it argues, is not "severe."

In theory, the Supreme Court has prescribed a "flexible approach" to reviewing ballot-access restrictions. A court should "first consider the character and magnitude of the asserted injury to the rights protected" and then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. "The Court must not only determine the legitimacy and strength of each of those interests; it must also

11

consider the extent to which those interests make it necessary to burden the plaintiff's rights."
*Id.*; *Storer v. Brown*, 415 U.S. 724, 729 (1974) (explaining that although "substantial burdens on
the right to vote or to associate for political purposes are constitutionally suspect and
invalid…unless essential to serve a compelling state interest," the Court's jurisprudence does not
"automatically invalidate[] every substantial restriction"; instead, it is all "a matter of degree").
*See also Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) ("Ballot access restrictions are evaluated
under a flexible standard that weighs the 'character and magnitude of the asserted injury'" to
protected rights "against 'the precise interests put forward by the State.'").

In practice, the Supreme Court has often applied what amounts to strict scrutiny
(although eschewing that label) to restrictions on ballot access upon finding a ballot-access
restriction to be a "severe" burden. "[W]e have accordingly required any severe restriction to be
narrowly drawn to advance a state interest of compelling importance" *Norman*, 502 U.S. at 289
(law unconstitutional as applied where it required more signatures for county office than
statewide office); *Socialist Party*, 440 U.S. at 184 ("When such vital individual rights are at
stake, a State must establish that its classification is necessary to serve a compelling state
interest"), 185 ("we have required that States adopt the least drastic means to achieve their
ends"); *American Party of Texas v. White*, 415 U.S. 767, 780 (1974) (upholding multiple
restrictions including 1% signature requirement, and explaining that their validity "depends upon
whether they are necessary to further compelling state interests" and goals that "cannot be served
equally well in significantly less burdensome ways").

However, the State is on firm ground when it argues that the very restriction at issue in
this case—a 5% signature requirement for congressional candidates not from established
parties—was not subjected to strict scrutiny by the Seventh Circuit when it was challenged on

equal protection grounds. *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768 (1997). In *Rednour*, the Court acknowledged the "fundamental" nature of the rights at stake, *id*. at 773, but determined that 5% requirement was a "rather minor burden" and not "severe on its face" in light of prior Supreme Court cases upholding similar requirements. *See id*. at 774-775 (citing *Jenness*, 403 U.S. at 433; *Norman*, 502 U.S. at 295). The Seventh Circuit expressly declined to inquire whether the 5% requirement was "narrowly tailored to satisfy the state's compelling interests," thereby rejecting strict scrutiny. *Id*. at 775. The opinion goes on to discuss the "rational manner" in which the restrictions functioned—applying what sounded like rational-basis review.

Thus this Court is bound by the holding that, in the usual course, Illinois' 5% signature requirement for independent and new-party candidates is not a "severe" restriction and should not be subjected to strict scrutiny. But the 5% signature requirement is not being applied in the ordinary course here. While the signature threshold remains unchanged, other material aspects of the ballot access scheme have been altered. The Plaintiffs argue that the combination of factors unique to this special election prescribed by § 25-5(b) distinguish this case from *Rednour*: foremost, they cite the shortening by one-third of the generally permitted signature gathering period; they also point to the absence of any ramp-up time in which a signature drive could be organized before the statutorily mandated signature-gathering period began, as well as the fact that the signature-gathering period encompassed December and January—months during which weather in the Chicago area is particularly inclement and in which there are a dearth of large scale, outdoor, public events during which signature drives are most successful. The Lewis plaintiffs add they were not permitted to gather signatures at the indoor public spaces of state colleges—among the few indoor public facilities where large numbers of district voters could be found. (In Illinois, private shopping malls can enforce trespassing laws against those on the

premises for purposes other than commerce.) These factors, which have been substantiated by testimony, coalesce to make the signature-gathering requirement imposed here more burdensome than what the plaintiffs in *Rednour* were up against.

Whether the restrictions rise to the level of imposing a "severe" burden on would-be candidates is another question. But under the flexible approach of evaluating ballot access restrictions adopted by the Supreme Court and the Seventh Circuit, as the burden on the protected rights increases, so must the justification offered by the state. Thus, although the Court stops short of declaring the Illinois laws for this special election "severe" restrictions on ballot access that trigger strict scrutiny, it cannot apply the very same standard that applied in *Rednour* when the laws work a greater restriction on the candidates and their prospective voters.

### 3. Balancing Of Interests

Applying a flexible approach, the Court must weigh the fundamental constitutional rights of political association and voting against the important state interests in quickly filling a vacant congressional seat in an orderly and fair way. Because of the increased burden here compared to that in *Rednour*, the state necessarily must offer some increased justification for its decision to truncate the signature-gathering period while leaving all other requirements in place. *Cf. Lee*, 463 F.3d at 771 (noting a "material difference" when there is a "shorter collection period and much earlier filing deadline" applicable).

Rather than relating its decision to the precise interests it articulates, though, the state primarily argues that the balancing has already been done, and this Court is bound by precedent, most notably *Rednour*, to uphold special-election law. But, as noted above, the Court well heeds the holding of *Rednour* that Illinois generally can impose a 5% signature requirement on independent and new-party congressional candidates without running afoul of the Constitution.

But *Rednour* did not purport to validate a 5% signature requirement in all contexts, at all times, in all conditions, and does not require the Court to turn a blind eye to factors in this case that distinguish how the law operates in the context of this special election from how it operated in the typical election cycle that *Rednour* addressed. All restrictions should be looked at together, because they may operate in tandem to create impermissible barriers. *See Storer*, 415 U.S. at 737; *Lee*, 463 F.3d at 768 ("Illinois's filing deadline and signature requirements must be addressed together and their constitutionality determined on the basis of their combined effect"); *Nader*, 385 F.3d at 735 ("Restrictions on candidacy must . . . be considered together rather than separately.").

Beyond merely resting on *Rednour*, the state does suggest that special elections are unique and that it has a particularly strong interest in timely filling a vacancy. Essentially, it argues that it is entitled to more deference—less scrutiny—because special elections pose special problems, and the citizens in the district deserve a representative in Congress as soon as possible. The State articulates a valid and important interest. For that reason, the decision to hold the election on the earliest and most efficient (coinciding with an already scheduled municipal election) date cannot be assailed. And holding an election on April 9 necessitated the shortening of the intervening deadlines, including the signature gathering period. This is another decision with which the Court does not take issue.

But the state's valid interest in the timing of the special election does not explain, or even rationally relate to, the arguments upon which the plaintiffs mount their challenge. Although the plaintiffs undoubtedly question the wisdom and—despite precedent—the constitutionality of the 5% and 90-day scheme that ordinarily applies, those requirements are not before the Court. In this case, the plaintiffs are concerned with the particular barriers to access that they (and any

similarly situated candidates) face with respect to the 62-day signature gathering period in this special election cycle. The State's interest in quickly filling the office is served by shortening the time period, but that choice creates additional obstacles to ballot access. The State argues that it is at liberty to ignore those obstacles because—in all cases—5% is an acceptable threshold. The Court does not agree the interest in speedily filling a vacancy can come at the expense of imposing new and unnecessary (as far as the record shows) burdens on the constitutional rights sitting on the other side of the scale. The State has simply declined to respond to, and therefore offer any justification for, the *new* burdens on new-party and independent candidates and their supporters in this special election—the absence of any time to prepare a signature gathering effort, the unavailability of public fora inside the district at which to gather, the harsh weather conditions that hinder both petition-gatherers and would-be signatories.[4] All it has attempted to justify is the decision to shorten the time period.

Digressing slightly, the Court is not persuaded that the State has any obligation when it comes to the morale of the Green Party supporters who, the plaintiffs assert, did not mount a signature-gathering campaign because they viewed the obstacles as insurmountable. Daunting though the task may have been, the Green Party was not entitled to rest on its belief that the signature requirement was unconstitutional while making no real effort to comply with it. It is well-settled and inarguable that the State is allowed to require some "substantial modicum of

---

[4] Although it was a factor trumpeted by the plaintiffs, the Court does not wish to overstate the constitutional significance of Chicago's inclement weather (or, for that matter the violent crime that Mr. Jones said plagues portions of the district). It undoubtedly heightened the plaintiffs' burden, but it is not a factor that the State is responsible for or can control, nor is it constitutionally required that special elections be scheduled such that signatures are always gathered in May and June. The State does have an interest in timely filling vacancies. The Court is nevertheless mindful that there is evidence that in this particular special election cycle, weather was a factor that inhibited candidates from meeting the large signature requirement in a short period of time. Its references to the weather should be taken in that vein, and not as a suggestion that extreme cold is *per se* relevant.

support" before placing a candidate's name on the ballot. With just days left before the February 4 deadline, however, the Green Party had *no* signatures to report—just a belief that a few supporters in Flossmoor were trying to get some. The Jones campaign (as distinct from the party) had not attempted to gather any signatures, nor did it have any plan for doing so. Although Jones and the party blame their non-efforts on the morale-crushing blow dealt by the 15,682-signature requirement, that is simply not the State's concern. Although it may not favor particular candidates or parties, neither must the state "handicap" new or unpopular parties or candidates to increase their chances of getting on the ballot. *Munro*, 479 U.S. at 198; *see Nader*, 385 F.3d at 736 ("If Nader could not recruit 100 canvassers in Illinois, his electoral prospects were dismal indeed"). Therefore, whether or not the Green Party plaintiffs' low-morale hypothesis is correct, it is distinctly not the province of the State to do anything about it.

The other burdens should not be born solely by the plaintiffs, though. However reasonable the 5% threshold under normal circumstances, when the state substantially reduces the time for compliance with signature-gathering requirements, it cannot just rest on the prior judicial approval of its arbitrary percentage. When questioned at the hearing why it maintained the 5% threshold despite allowing less time, the State replied that 15,682 signatures are required to demonstrate a "substantial modicum" of support. But that plainly is not the case. In some circumstances, *e.g.*, the first election following redistricting, the state has decreed that a flat 5,000 signatures suffices to show the "substantial modicum" of support needed to get a new party candidate on a congressional ballot. And in every election where the signature requirement is derived on the basis of voter turnout, the ultimate number of signatures required will vary dramatically; indeed, given the larger turnout in 2012, it will almost always be a number less than 15,682. So it is of course not correct to say as an objective matter that 15,682 signatures

equals "a substantial modicum." And the State offers no explanation for its position that, in this election, *only* that number will do. Perhaps this is because the Seventh Circuit has observed, appropriately, that any number, whether expressed as a total or a percentage, will be arbitrary. *Stevo v. Keith*, 546 F.3d 405, 408-09 (7th Cir. 2008). That is surely true, but it does not follow that any number will do. Outer limits exist. Even the State conceded this at the hearing, agreeing with the Court that at some point, perhaps with a two-week or one-day time period, a 15,682-signature requirement would become a literal impossibility, and therefore impermissible.

But the plaintiffs do not have to satisfy an impossibility standard. This is an exercise in balancing, not in absolutes. At some point, the burden becomes too onerous for a "reasonably diligent" candidate to meet, and it is at that point that the State's interests must yield. *See Storer*, 415 U.S. at 743. With both their lay and expert testimony, the plaintiffs have made a credible case that the 15,682 signature requirement could not be met in *this* 62-day period in *this* congressional district by their independent and new-party candidates. They have also submitted some historical evidence to bolster their arguments. *See Storer*, 415 U.S. at 742; *Lee*, 463 F.3d at 769 ("ballot access history is an important factor in determining whether restrictions impermissibly burden the freedom of political association). It differs in kind from that which has been persuasive before; in *Lee*, for example, the court noted the inability of independent candidates to get on Illinois state legislature ballots for 25 years. Here, the plaintiffs largely expand the geographical scope of the comparison and, admittedly, compare "apples to oranges" somewhat. But Winger's testimony does provide context and corroborate the plaintiffs' testimony that they face a very substantial burden indeed.

The degree of the burden on the plaintiffs is almost uncontroverted by the state's evidence. Their sole witness on this subject was Mr. Hubschman, who, while eminently qualified

his field, did no more than establish that it is theoretically possible for *a* candidate to gather 15,682 signatures in 62 days. But the only specifics he could give were in elections where his firm used paid professionals to gather signatures and/or organize squads of volunteers to do so— professionals who are much more efficient than volunteers in obtaining valid signatures, and who, of course, *must be paid*. A candidate could spend $70,000 under the circumstances of this case, according to Hubschman That is a high cost of entry for independent and new-party candidates, one that the plaintiffs in this case could never pay (keeping in mind the lack of time in which to solicit donations). Hubschman all but conceded he could do nothing for the $3000 Lewis spent in his last effort. Alternatively, Hubschman said that a cadre of highly motivated and trained volunteers could—theoretically—get 15,682 signatures in 62 days. He could not cite a single example of that (or something like it) having ever occurred, and he said it was "simply not possible" to say how much his firm would charge to train such a volunteer corps. He suggested he might do it *pro bono*, but he has never done so. Indeed, his considerable experience in running petition drives does not include any for non-incumbent new-party or independent candidates. Thus, to the extent that Mr. Hubschman credibly established that it is theoretically possible under laboratory conditions to gather 15,682 signatures in 62 days, all he does is refute the argument that it is literally impossible to do so. But that is not the standard.

Weighing all of the state's important interests against those of the plaintiffs, the Court concludes that the plaintiffs have shown a reasonable, and certainly better than negligible, likelihood of success on the merits. Based on the evidence and arguments presented in this expedited process, the state's interest do not appear to justify the additional burdens it has placed on independent and new-party candidates to access the special election ballot. Although it is not literally impossible to meet the 5% threshold in 62 days, the Court concludes that burden of

doing so amidst the other factors raised by the plaintiffs, and unanswered by the State, is too high to pass muster.

### B. Other Preliminary Injunction Factors

The plaintiffs satisfy the remaining factors necessary to obtain preliminary injunctive relief with little difficulty. The plaintiffs easily demonstrate that they would suffer irreparable harm without preliminary injunctive relief. It is self-evident that an otherwise qualified candidate would suffer irreparable harm if wrongfully deprived of the opportunity to appear on an election ballot; so would the citizens who would have voted for him and the members or prospective members of the party, if any, who supports the candidate. *See, e.g., Johnson v. Cook County Officers Electoral Bd.*, 680 F.Supp. 1229, 1232 (N.D. Ill. 1988). Indeed, the State has not disputed that plaintiffs would be subject to irreparable harm.

The plaintiffs have also shown that the balance of harms favors them. An injunction that potentially affects the makeup of the ballot would not increase the state's administrative burden, provided that it still has enough time to print the ballots. The state has conceded that it need not print ballots until March 8; that is why it allowed signatures to be submitted as late as February 4. Its orderly election procedures would remain essentially intact. And there is no risk of ballot-crowding here; at most, two additional names would appear on the ballot. The evidence in this case (based on Mr. Winger's uncontroverted testimony) is that listing more than eight candidates on a ballot for one office correlates with voter confusion; there is no danger of approaching that number here. Anyway, the State was comfortable allowing 17 Democrats and 5 Republicans to crowd the primary ballots, so the Court will not overstate the obviously fleeting importance of this interest to the State.

The Court does agree, though, that any injunction extending the 62-day period would tip the balance of harms back toward the State. The plaintiffs put on no evidence to controvert the State's affidavit attesting that the Board needs from February 4 to March 8 to receive and resolve all challenges before printing the ballots and mailing them overseas. The Court wonders what challenges there will be to resolve if the minor-party and independent candidates are not successful, but there is nothing in the record on this point and the Court will not speculate further. Moreover, it was only at the conclusion of the hearing that the Green Party plaintiffs first suggested extending their time to gather signatures. They did not "sleep on their rights," as the State suggests—this lawsuit was filed with due urgency. But they did demonstrate a total lack of diligence in attempting to collect signatures throughout the 62-day period, despite this Court's admonition at the initial hearing on January 3 that all the plaintiffs would be best served by proceeding as though 15,682 signatures would be due on February 4. An extension of time seems a particularly inequitable remedy under the circumstances. As for plaintiff Lewis, he clearly acted diligently under the circumstances. However, his testimony did not suggest that his efforts would bear substantially more fruit even if allowed to continue for two more weeks.

Finally, the public interest would not be harmed by an injunction that increases ballot access. There is no public interest in preserving an exclusively two-party ballot or excluding qualified candidates. And there is no evidence that voters would be burdened by the inclusion of two additional candidates, so the more compelling public interest in is the expression and associational rights of the plaintiffs.

**REMEDY**

The final question is the appropriate remedy. The Court has already rejected the prospect of an injunction that extends the petition-gathering period. So too will it reject out of hand the

other relief plaintiffs suggested: placing them on the ballot or holding them to the .5% signature requirement applicable to the Republican primary contenders (525 signatures). Both of these remedies would effectively remove any barrier to ballot access. That would fly in the face of the Supreme Court's consistent refrain that states have a valid—even "compelling"—interest in requiring any candidate for office to first show a substantial modicum of support. *See Munro*, 479 U.S. at 194 ("*Jenness* and *American Party* establish with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.").

The constitutionally appropriate remedy, in the Court's view, is to adjust the signature requirement to reflect the balance of the valid interests on both sides. The status quo is insufficiently respectful of the plaintiffs' constitutional rights. Removing the requirement altogether would obliterate the state's interests. All the Court can do, therefore, is pick another number.

But is it the place of this Court to second-guess the State's decision to impose the full 5% requirement despite shortening the period, removing the possibility of organizing a petition, and designating the signature-gathering period during the coldest, most desolate time of year? On the one hand, the Seventh Circuit has telegraphed disapproval for district judges meddling in state elections. *See Stevo*, 546 F.3d at 409 (repeating "warn[ing] . . . against federal judicial micromanagement of state regulation of elections"). On the other hand, that Court has spoken strongly in support of the necessity of district judges using their broad equitable powers to craft appropriate remedies for unconstitutional election procedures, even where those procedures are compelled by state statutes. *Judge v. Quinn*, 624 F.3d 352, (2010) ("*Judge II*") (discussing the equitable powers of district courts to fashion remedies that include dictating what candidates

22

participate in a special election). The Court considers this a case in which blind deference to the state regulation would be inconsistent with important constitutional concerns. The Court holds that it should therefore provide a remedy that it believes provides a constitutionally valid balancing of the competing interests at stake in this dispute. On that basis, the Court holds that the State may not require that any new party or independent candidate submit more than 3,444 valid signatures in order to be included on the ballot for this special election.

Like any figure meant to approximate so inchoate a concept as "substantial modicum of support," this number is somewhat arbitrary. But the number is not, at least, grasped from thin air. In redistricting years, to accommodate the uncertainty of new boundaries, the State deems 5,000 valid signatures to suffice to demonstrate that a candidate enjoys a "substantial modicum" of support. *See* 10 ILCS 5/10-2, 10-3; *Stevo*, 546 F.3d at 406. The choice of this flat, and at least in the heavily populated second district, lower number likely reflects a judgment that redistricting "is a disorienting event for voters and candidates alike, since it changes the electorate." *Stevo*, 546 F.3d at 408.In that regard, the is some commonality between an initial election following a redistricting and a special election that provides some additional support for using that number as a barometer for whether a candidate has the requisite baseline of support. But in other respects, simply adopting the 5,000 signature requirement would repeat the sins of the state's continued use of the 5% requirement: it would ignore the factors that distinguish this special election process from a normal election cycle, where signatures are gathered in the Spring, where the signature gathering period last 90 days, and where all prospective candidates know well in advance when the election will be held (and therefore when the signature-gathering period will commence). Thus, some further reduction to account for these factors is appropriate,

and a proportional reduction based on the shortened signature period is a good as any. The 3,444 figure derives from there: (62/90) x 5,000.

The Court acknowledges that, with signature gathering period set to close on Monday February 4, it is highly unlikely that candidate Lewis, despite his diligence, will round up enough signatures. It seems likely, too, that the Green Party and Mr. Jones will miss this cut-off because they did not find it worthwhile to begin a signature campaign under what they considered an unconstitutional ballot-access scheme. There may be no practical effect on these plaintiffs at all. But it is not this Court's place any more than it is the State's to help any particular candidates get on an election ballot. This Court's sole function is to make sure that the state does not erect insurmountable barriers to access. If the new threshold is also insurmountable for the plaintiffs as a practical matter, it is not primarily for reasons the State imposed.

* * *

Accordingly, for its order in the case, the court GRANTS the motions for preliminary injunction and ENJOINS the defendants from enforcing the Illinois Election Code to the extent it requires any new-party or independent candidate to obtain in excess of 3,444 valid signatures to appear on the ballot for the April 9, 2013 special election in the Illinois Second U.S. Congressional District.

Entered: February 1, 2013

_____
John J. Tharp, Jr.
United States District Judge

24